UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | Case No. 26-cr-008-MAD |
| | ) | |
| V. | ) | |
| | ) | |
| **GREGORY PUZIO**, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Gregory Puzio's arrest on child pornography charges capped an unfortunate descent into this disturbing online world. Yet it is not and should not be a defining feature of his life overall, even as it will dictate his whereabouts for the foreseeable future. Greg has been married for over 20 years, has four children, and was a longtime postal employee. He lost his job and the financial security it offered, as well as his role as the primary breadwinner and as one of his son's primary caretakers. His family is standing by him for now, but those bonds can fray further once he is incarcerated for a lengthy period of time in a distant prison. He will be losing his liberty for a minimum of five years, and possibly longer.

On January 22, 2026, Greg waived indictment and pleaded guilty to one count of receiving child pornography, in violation of 18 U.S.C. § 2252(A)(2)(a), and pursuant to an agreement with the Government. He did so relatively quickly after being charged, which echoed his candid post-arrest admissions the night he was initially taken into custody. He accepted responsibility quickly and clearly, and this has been the case through the course of this prosecution. No one has been harder

on Greg than he has himself. Sentencing is scheduled for November 10, and Greg has not opposed the Government's requested adjournments to account for victim restitution. The advisory Guidelines range is far higher than the five-year mandatory minimum sentence, and is set instead at 151-188 months[1]. However, for the reasons that follow, a sentence at or closer to the 60-month minimum, is sufficient but not greater to fully effectuate the purposes of sentencing outlined in 18 U.S.C. § 3553(a).

Greg is now 41. Prior to 2025 and the events that led to this case, he had never been arrested before. He has been detained for the duration of this case (although he had previously been released on the related State prosecution) at Rensselaer County Jail. He did not seek release, even though he may have been a good candidate for such, in light of his minimal criminal history, consistent work history, family responsibilities and community ties. Upon being booked into jail when he was initially arrested, Greg suffered a cardiac event that required EMS

[1] This range is higher than the parties contemplated in concluding plea negotiations. Those discussions, memorialized on the record and in the appellate waiver in the agreement, had instead envisioned a range of 121-151 months. The discrepancy is the result of a two-level enhancement for knowing distribution under U.S.S.G. Ch. 2G2.2(b)(3)(F), which was not included in the plea agreement. It appears in the PSR nevertheless at Paragraph 29, and we have declined to object, based on Greg's own post-arrest admissions to the arresting agents. Therefore, we anticipate it will be included in the Court's final Guideline calculations. Either way, Mr. Puzio would have requested a sentence under the applicable range, and I do not mean to credit the Guidelines more than their worth, at least in this kind of case. Still, our expectation in entering into the plea agreement was that the Guideline range would be 121-151 months, and we ask the Court to defer to that range as a starting point for consideration.

involvement. Greg is married to his high-school sweetheart, and they have been together for over 20 years. Together they have four children ranging from 1 to 21.

He was born and grew up in the Albany area, an only child. His parents split up when Greg was young and he went back and forth between them. His father continues to reside in this area, while his mother moved to Florida. He remains in contact with both, although his father's health has taken a turn for the worse in recent months. Mr. Puzio worries about not being present if and when his father's medical condition deteriorates further.

As a result of complications during birth, Greg's oldest son, who is now 21, was diagnosed with cerebral palsy, causing severe limitations as to his mobility and ability to care for himself. He relies on his mother and (prior to his arrest) on Greg to meet his daily needs. Greg's other sons are autistic and in special education classes. Rather than the offense conduct, disturbing as it is, Greg's character is seen most clearly in the way he has cared for his children. They have been and prior to his arrest were the center of his life, which makes his separation and imprisonment all the more painful to endure. While Mr. Puzio does not have a history of mental illness, he acknowledges feeling the weight of the "burden" that he has left for his family. PSR ¶ 58.

Greg's place at the center of his family comes across clearly in the attached character letters. His wife Laura writes that Greg "is not just part of our family – he is a foundation of it." Despite circumstances that can be overwhelming at times, Gregory is a constant source of support and kindness. His son Michael writes that

his father "has always been a constant, loving presence in my life – someone I can rely on no matter what I am facing." He continues: "He understands me, shows incredible patience, and takes the time to truly listen, even when communication is difficult. He has never made me feel different or less than – only loved, respected, and supported." Greg's "love gave [him] strength when [he] felt like he had none." *Id.* He always puts family first, and a is a "naïve, quiet and loving young man." VanValkenburg.

Others, including family friends, view Greg as a father figure who has offered guidance, kindness and support when needed the most, and a sense of belonging never experienced before. Chiarello. Greg has been a "constant, hands-on caregiver – providing not only financial support but also daily physical care, emotional stability, and unwavering education." Wilkes. He also "has always been present and involved in every aspect of his children's lives," and "consistently shows love, generosity and commitment." Wilkes. Greogry is a "devoted father, and a compassionate person whose life centers around his family. [He] is always willing to help others when they are in need." Kurick.

Surely there is good in Mr. Puzio, and more to him than his offense conduct. But there was also a darkness in him, manifesting itself in the offense conduct. He is looking forward to getting past it, and his strong support network is a key part of that rehabilitation. His wife has already spoken of her capacity to forgive him and welcome Greg back into their lives, and to support him in his recovery. Beyond that, Greg looks forward to the type of therapy, treatment and counseling that will

hopefully be available to him in prison, and while he is on supervised release for a lengthy period. This will be important in understanding his demons, and helping him move past them and not revert back to such behaviors.

As to the offense conduct, there is not much to say that distinguishes it from others. The Court has surely seen too much of this and similar cases in recent years. As noxious as the internet and child pornography are, the compulsive use of messaging apps like TeleGuard seem to make things worse. They offer the illusion of community and belonging for individuals who are often isolated, and with deviant tendencies. Those tendencies become emphasized or magnified, and it becomes almost a race to the bottom as to who can say or do the most outlandish, repulsive thing. The investigation here had as its genesis Mr. Puzio's presence in a private chat group that discussed child sex abuse and associated materials. Mr. Puzio's comments in the chats, as disturbing as they are, seem more in the realm of fantasy than reality. Nevertheless, because law enforcement would not have necessarily known, they sought to intervene and potentially prevent imminent illegal activity. While such activity would not have occurred, Greg nevertheless waived his *Miranda* rights and confessed to viewing child pornography, acknowledging both his disgust in his conduct and that he has a serious problem. He consented to a search of his phone, which revealed the downloaded images and videos that are the subject of the case. And his comments in his post-arrest interview are similarly the product of disgust and self-loathing; hopelessness in his darkest moments does not necessarily

carry over now that he has had significant time for reflection and greater consideration. As stated above, Mr. Puzio is his own harshest critic.

**The Guideline Recommendation Should be Rejected**

Beyond the mandatory minimum, the Guideline recommendation is significantly higher, driven relentlessly upward by overlapping enhancements that are routine and all but inherent in the offense. Years ago, the Circuit has made it "emphatically clear" that the Guidelines are *truly* advisory. *See United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (emphasis added). They cannot be presumed reasonable, are merely one factor among many, cannot be ascribed more weight than the other statutory factors, and "constitute [] only a touchstone in the district court's sentencing considerations." *See United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); (citing cases); *see also Nelson v. United States*, 129 S. Ct. 890, 892 (2009); *Gall v. United States*, 552 U.S. 38, 59 (2007); *Rita v. United States*, 551 U.S. 338 (2007). We do not start out with "any thumb on the [Guideline] scales." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring). More, the Guidelines may be excessive "even in a mine run case," and extraordinary circumstances are *not* required to justify a downward variance. *Id.* at 109-10; *United States v. Stewart*, 590 F.3d 93, 135 (2d Cir. 2009).

The reasonableness of a particular sentence is not measured by how closely it hews to the advisory guideline range. *See Gall*, 552 U.S. at 47-48 (eschewing a framework that relies on a rigid mathematical formula or extent of the deviation from the Guidelines as a reliable indicator of reasonableness); *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) ("Reasonableness is determined instead by

the district court's individualized application of the statutory sentencing factors"). A reasonable (and fair and just) sentence reflects the 3553(a) factors, whether or not it happens to coincide with the Guidelines. And deciding upon a just criminal sentence is hardly the mathematical, formulaic exercise the Guideline regime relies upon. *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (criticizing the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic"). Further, "sentencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012).

The sentencing court's greater familiarity with the individual defendant and circumstances of the offense before it provides an institutional advantage over the Sentencing Commission in making individualized sentencing determinations. *See Gall*, 552 U.S. at 51-52; *Rita*, 551 U.S. at 357-58. The Sentencing Commission, for its part, enjoys an institutional advantage through its resources and mission to compile and analyze empirical data and national experience on a systemic level. *See Kimbrough*, 552 U.S. at 109; *Mistretta v. United States*, 488 U.S. 361, 379 (1989). Deference to the Commission's Guidelines thus springs from their genesis as "the product of careful study based on extensive empirical evidence derived from review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46.

However, guidelines that are *not* based on empirical data and national experience do not exemplify the Commission's exercise of its "characteristic

institutional role." *Kimbrough*, 552 U.S. at 109; *Rita*, 551 U.S. at 348-50. *Kimbrough* and other cases make clear that the sentencing court may give ample effect to policy disagreements with such Guidelines (and others) that lack a basis in empirical data and national experience. *See Kimbrough*, 552 U.S. at 100-10; *United States v. Henderson*, 649 F.3d 955, 961-64 (9th Cir. 2011). Without such basis, the rationale for deference to that kind of Guideline evaporates.

*Dorvee*, 616 F.3d at 188, and subsequently *United States v. Jenkins*, 854 F.3d 181, 190 (2d Cir. 2017), both wrote at length on this issue while critiquing the child pornography Guideline under Chapter 2G2.2:

> This deference to the Guidelines is not absolute or even controlling; rather like our review of many agency determinations, [t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, [and] the validity of its reasoning … On a case by case basis, courts are to consider the specialized knowledge and broader investigations and information available to the agency as it compares its own expertise at sentencing and, on that basis, determine the weight owed to the Commission's Guidelines.

Here, with respect to the applicable child pornography guideline, there is no "thoroughness" evident in the Sentencing Commission's considerations. To the contrary, it was Congress, acting for political rather than sound penological reasons, that directed the Commission to promulgate the child pornography guidelines where they are now set, vastly increasing sentences relative to where they were initially[2]. *See id.* at 184-86; *Henderson*, 649 F.3d at 960-62; *United States v.*

---

[2] The original 1987 Guidelines would appear to have created a range of 24-30 months, before the Guidelines became bloated with more dubious enhancements in the years since.

*Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wisc. 2008) (noting that presence of routine, increasing enhancements was "the result of arbitrary increases by Congress slipped into other bills, often with little or no debate"). As a result, judges have especially broad discretion to disagree with the excessive sentences such Guidelines produce. *See, e.g.*, *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1104 (N.D. Iowa 2009) (concluding that "§ 2G2.2 should be rejected on categorical, policy grounds, even in a 'mine-run' case, and not simply based on an individualized determination that it yields an excessive sentence in a particular case"); *see also Spears v. United States*, 551 U.S. 261 (2009). As discussed more below, Judges routinely use that discretion to sentence child pornography defendants well underneath the applicable Guideline.

*Dorvee* and *Jenkins*, among others, again demonstrate in detail how unreasonable sentences result from guidelines created by congressional mandates rather than empirical data and experience. *See* 616 F.3d at 184, 188 (encouraging district judges to use broad discretion and to "bear[] in mind that they are dealing with an eccentric Guideline of highly unusual provenance"); 854 F.3d at 189 (noting "important advances in our understanding of non-productive child pornography offenses since we decided *Dorvee*" in course of reversing Guideline sentence as substantively unreasonable). The panel in *Dorvee* was especially disturbed at how routine sentencing enhancements, discussed below, "result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases," and determined that "unless applied with great care, [the Guidelines] can lead to

unreasonable sentences that are inconsistent with what Section 3553 requires." *Id.* at 186. In such situations:

> adherence to the Guidelines results in virtually no distinction between sentences for defendants like Dorvee and sentences for the most dangerous offenders who . . . fall in higher criminal history categories. This result is fundamentally incompatible with §3553(a). By concentrating all offenders at or near the statutory maximum, [the Guideline] eviscerates the fundamental statutory requirement in §3553(a) that district courts consider the nature and circumstances of the offense and the history and characteristics of the defendant and violates the principle, reinforced in *Gall*, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct.

*Dorvee*, 616 F.3d at 187.

The Guideline calculation for the vast majority (including here) of child pornography offenses has thus become driven by overlapping enhancements "all but inherent to the crime of conviction." *See United States v. Abraham*, 944 F. Supp. 2d 723, 729 (D. Neb. 2013) (quoting *Dorvee*, 616 F.3d at 186)); *see also United States v. Broxmeyer*, 699 F.3d 265, 299 (2d Cir. 2012) (lamenting that "many of the enhancements [in an analogous child pornography Guideline] reflect no incremental evil beyond the base offense itself"); *Jenkins*, 854 F.3d at 190 (re-affirming the "all but inherent" character of 2G2.2 enhancements). In practice, and as these and other cases have bemoaned, the guideline leaves little room to distinguish the more aggravated offenses and offenders from less culpable offenders like Mr. Puzio, who have no criminal history and so much to lose.

It has gotten to the point where a Guideline sentence in a child pornography case is more the exception than the norm, and by a margin of about two to one. In

2025, just 38% of child pornography defendants were sentenced within or above the applicable Guideline range, out of more than 1,400. In 2023, the figure was even lower, just under 35%.[3] This means that nearly two-thirds of child pornography defendants are routinely sentenced underneath the applicable Guideline, sometimes as low as between 28-30%[4]. Limiting consideration to just the Chapter 2G2.2 Guideline does not change the results (where Guideline sentencing and upward departures represent 38% of the total), indicating that the problem is very much with *this* Guideline and not necessarily others in Chapter 2G2. Years earlier, of course, the Commission had already determined that "defendants sentenced under the non-production child pornography guidelines have received sentences outside of the applicable guidelines more frequently than defendants in all other major types of federal criminal cases." U.S.S.C., *Federal Child Pornography Offenses*, at 7 (Dec. 2012[5]). Thus, while a Guideline sentence might be warranted for a relatively small class of defendant with either a more

---

[3] These numbers come from Sentencing Commission annual data, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2025/Table31.pdf and https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table31.pdf.

[4] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf, Table 31; https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/2018-Annual-Report-and-Sourcebook.pdf, Table 31.

[5] Available at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses

aggravated history, more aggravated offense conduct, or both, Mr. Puzio should not be classified in that group of offenders.

The JSIN statistics tell a similar story. Of 800 defendants at offense level 34 as noted in the PSR (¶ 92), the average sentence was 110 months, whereas the median was 98 months. In other words, the median sentence represents a 35% reduction from the low-end (151 months) of the applicable Guideline range. Consistent with such findings, only 21% of the 800 received a Guideline term, whereas 76% received a downward variance or departure. Of course, the JSIN numbers do not account for the presence of mandatory minimum terms that *require* a certain sentence, irrespective of the Judge's faithful application of the 3553(a) factors. Surely the numbers would be even lower in the absence of mandatory minimum terms that apply to most child pornography sentences either because of the conduct, the recidivist element or both. Another reason they are an imperfect metric – a reference point and not a lodestar – is that the average (or median) accounts for the presence of a substantial number of more aggravated cases that further skews the numbers upward. In the absence of these cases that are not categorically similar to Mr. Puzio's, the numbers would be lower still.

The various and sundry enhancements drive up the base offense level here from **22** (41-51 months) to **37** (210-262 months prior to acceptance of responsibility), which exceeds the 20- year statutory maximum. By themselves, the enhancements serve to *multiply the advisory sentence fivefold.* Yet such factors or characteristics would hardly distinguish this offense from what has come to be the mine-run

offense and the way in which people access such materials. *See Hanson*, 561 F. Supp. 2d at 1008-09 (critiquing arbitrariness of enhancements that apply because of "factors present in many if not most cases" and which "seems an odd way of measuring culpability"); *United States v. Mallatt*, 2013 U.S. Dist. LEXIS 168777, at *53 (D. Neb. Nov. 27, 2013) (concluding that Chapter 2G2.2 "consists of a hodgepodge of outdated enhancements that apply in nearly every case, rather than furnishing any means to carefully differentiate between offenders based on culpability and dangerousness"). The Guideline is broken, and we question the justification for or the need to continue to cleave to it.

Again, statistics tell the tale: not one specific offense characteristic serves to actually distinguish the offense conduct from the heartland offense that the guideline is meant to punish. Nor do they bear any logical relation to greater culpability. In context, these enhancements do not aggravate the offense so much as constitute the baseline of what this offense has become, and how it is regularly committed: in 2025, of more than 1500 defendants sentenced under the Chapter 2G2.2 Guideline, more than 93% received the 2G2.2(b)(2) enhancement because the victim in the image had not reached the age of 12[6]. More than 97% received the two-level enhancement for using a computer[7]. More than 77% of defendants had

---

[6] All of these figures come from the Sentencing Commission's annually published data, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2025/Ch2_Guideline_FY25.pdf, at 98-99.

[7] The former Chief Judge of the Western District of Oklahoma analogized this to enhancing the penalty for speeding, if a car was involved. *See*

their guideline range enhanced another five levels because the offense conduct included more than 600 images under § 2G2.2(b)(7)(D). Further, more than 81% received a 2G2.2(b)(4) enhancement because of the aggravating content of the images in question. Even the distribution enhancement is very much the norm, as some form of distribution occurred in more than half of child pornography cases (whether or not the offense of conviction is distribution). Again, applying such enhancements is mostly static, and does not differ appreciably in years past[8].

Even the Sentencing Commission has repeatedly taken issue with its own guidelines that Congress foisted on it. *See, e.g.*, 2012 Report, *supra*, at 320-26; *Jenkins*, 854 F.3d at 190 (noting that Sentencing Commission has "effectively disavowed" the child pornography Guideline, which "can easily generate unreasonable results"); *Mallatt*, 2013 U.S. Dist. LEXIS 168777, at *31-40, 61 (concluding that the Guidelines "are not a reliable indicator of the Sentencing

---

https://www.ussc.gov/sites/default/files/Austin_Transcript.pdf. This enhancement and the one for the number of images are particularly poor proxies for culpability, and should be applied sparingly or at least with great scrutiny.

[8] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2024/Ch2_Guideline_FY24.pdf, at 98-99; https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Use_of_SOC_Guideline_Based.pdf; https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2019/Use_of_SOC_Guideline_Based.pdf, at 44-45; https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2018/Use_of_SOC_Guideline_Based.pdf, at 45.

Commission's view of what a fair sentence should be in nonproduction child pornography cases . . . made obvious by the Commission's December 2012 report, criticizing § 2G2.2 and recommending major revisions to the Guidelines"); *United States v. Donaghy*, 2010 U.S. Dist. LEXIS 77007, at *7 (E.D. Wisc. June 24, 2010) (citing cases describing how Sentencing Commission "actively opposed" certain Guideline enhancements).

The Sentencing Commission updated its critique in June 2021, lamenting that its 2012 recommendations fell on deaf ears in Congress. *See* U.S.S.C., *Federal Sentencing of Child Pornography: Non-Production Cases* (June 2021), available at https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses. The report further took issue with the lack of charging uniformity across different districts as to receipt versus possession. *See id.* at 48-50. However, it also ticked through the various enhancements that are applied here, and echoed many of the observations above as to the Guideline's failure to distinguish more aggravated offenses or offenders from run-of-the-mill ones, based on specific offense characteristics that are routine and ubiquitous and in no real sense serve the goal of differentiation. *Id.* at 56-59. It further lamented that the enhancements have not kept pace with technological advances and ubiquitous practices, to the point where the Guideline is thoroughly outdated. Of course, it is one thing to hear such arguments from defense lawyers or even judges, but it strikes differently when the critique comes from the Sentencing Commission

itself. It simply underscores that the Guideline is effectively broken and that Congress has not taken any steps to fix it.

These arguments are well-chronicled elsewhere, and we do not wish to belabor the point. *See e.g.*, *Henderson*, 649 F.3d at 960-64; *United States v. Apodaca*, 641 F.3d 1077, 1083-84 (9th Cir. 2011); *United States v. Grober*, 624 F.3d 592, 603-10 (3d Cir. 2010); *Mallatt*, 2013 U.S. Dist. LEXIS 168777, at *23-40; *Donaghy*, 2010 U.S. Dist. LEXIS 77007, at *6-7 (collecting cases and finding Chapter 2G2.2 a "provision that courts across the country have recognized is seriously flawed and accordingly entitled to little respect"). In short, we ask the Court to take the guidelines into account, as it must, but to recognize serious flaws with such calculations and the sentences they suggest. Their infirmities would be evident in nearly any case, and are no less problematic here.

For all these reasons, we ask the Court to take Mr. Puzio's life history and individual circumstances – including his lack of criminal history, and the central, primary role he occupies in his family-members' lives - into account and to impose a minimum, though still substantial sentence. Explicitly recognizing such mitigating factors is in keeping with the best traditions of sentencing, and should not offend the victims of these offenses who have suffered tremendously in turn. "In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.'" *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017). A sentence of

five years' imprisonment, or something close to it, is sufficient punishment for the offense, adequately protects the public, but still offers hope for the future, and the chance for Greg to rebuild his life and put this lamentable chapter behind him for good.

October 21, 2026

Respectfully submitted,

ERIC K. SCHILLINGER
Federal Public Defender

By: /s Jeremy B. Sporn, Bar No. 703650
Assistant Federal Public Defender
Northern District of New York
54 State Street, Suite 310
Albany, New York 12207
Jeremy_sporn@fd.org